UNITED STATES of America, Plaintiff,

v.

BASF–INMONT CORPORATION, Chrysler Corporation, Ford Motor Company, General Motors Corporation, Sea Ray Boats, Inc., Reichhold Chemicals, Inc., Sherwin–Williams Company, Grow Group, Inc., Mayco Plastics, Inc., Bundy Corporation, Fillmore Thomas & Co., Inc., Kelsey–Hayes Company, Metal Alloys Corporation, Met–L–Aid, Incorporated, Spencer Oil Company, The Stroh Brewery Company, White Color Card Company, Consumers Power Company, Allied–Signal Inc., Hoover Universal, Inc., Pratt & Lambert Inc., Petschke Manufacturing Company, Inc., Henkel Corporation, Electro–Cote Chemical Co., Inc., Doehler–Jarvis Limited Partnership, Mercury Pain Company, Lapeer Metal Products Company, Cincinnati Milacron Inc., PPG Industries, Inc., Foamseal, Inc., Graco Inc., Laidlaw Waste Systems Inc., BFI of North Metro, Inc., Richfield Disposal, Inc., and Olsonite Corporation, Defendants.

Civ. A. No. 91–CV–40320–FL.

United States District Court,
E.D. Michigan, S.D.,
at Flint.

March 17, 1993.

**603**

Geneva S. Halliday, Asst. U.S. Atty., Detroit MI, Richard B. Stewart, Barry M. Hartman, U.S. Dept. of Justice, Environmental and Natural Resources Div., Washington DC, for U.S.

Susan E. Morrison, Siudara, Rentrop, Martin & Morrison, Bloomfield Hills MI.

Thomas M. Woods, Cross Wrock, Detroit MI.

Mark D. Edie, Ford Motor Co., Dearborn MI.

David L. Tripp, Dykema Gossett, Detroit MI.

David P. Flynn, Phillips, Lytle, Buffalo NY.

Leonard F. Charla, Butzel Long, Detroit MI.

Allen Danzig, The Sherwin–Williams Co., Cleveland OH.

Michael L. Miller, Browning–Ferris Services, Inc., Houston TX.

BASF–Inmont, c/o Ronald Zdrojeski, Hebb & Gitlin, Hartford CT.

Thomas Wilczak, Pepper, Hamilton & Scheetz, Detroit MI.

Kittredge R. Klapp, Neithercut, Klapp, Dillard, Banas & Grossman, Flint MI.

John P. Dickey, Consumers Power Co., Jackson MI.

Kenneth Lamotte, Greenfield Partners, Birmingham MI.

Jay A. Herbst, Driggers, Schultz, Herbst & Patterson, Troy MI.

Edward L. Haroutunian, Mark E. Wilson, Rubenstein, Isaacs, Haroutunian & Sobol, Southfield MI.

Susan J. Sadler, Clark, Klein & Beaumont, Detroit MI.

Eric M. Dessen, NL Industries, New York City.

Electro–Cote Chemical Co., William DiBiasi, Taylor MI.

Sharon R. O'Keefe, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit MI.

William R. Cottick, Laidlaw Waste Systems, Associate Gen. Counsel, Burlington, Ontario, Canada.

Juliette Richter, c/o Henkel Corp., Amchem Products Inc., Gulf Mills PA.

Gregory A. Fontaine, Dorsey & Whitney, Minneapolis MN.

James P. Davey, Kemp, Klein, Umphrey & Endelman, P.C., Troy MI.

Philip J. Anderson, Blomberg, Anderson & Moore, Mt. Clemens MI.

Donald W. Smith, Pratt & Lambert, Buffalo NY.

James A. Thompson, Jr., Pepe & Hazard, Hartford CT.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Pending before the Court in this CERCLA case [1] are the following motions: (1) Motion to Approve the Consent Decree; (2) Motion by Citizens United to Intervene. The Consent Decree is APPROVED, and the Motion to Intervene is DENIED.

---

1. Comprehensive Environmental Response Compensation and Liability Act (CERCLA) as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9601 *et seq.* The Sixth Circuit has recently reviewed the background of these acts in *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1416–1418 (6th Cir.1991). This opinion presumes knowledge of CERCLA procedures as discussed at *id.*

## BACKGROUND

The Metamora Landfill Site in Lapeer County, Michigan is a CERCLA Superfund Site ("Site") that served from 1955–1980 as a privately owned dump. The Site is located approximately 4,000 feet east of the Village of Metamora. Defendant's Brief in Support of Motion for Entry of the Metamora Consent Decree, Ex. 19, ("Defendant's Ex. 19") App. 31 at 1.

After drums containing hazardous substances were discovered at the site in 1981, the Michigan Department of Natural Resources, ("MDNR") conducted a magnetometer survey which indicated that as many as 35,000 drums might be present in five disposal areas around the site. The survey estimated that the areas labelled "one" and "four" in the Site contained about three-fourths of the drums buried at the Site. The Site was placed on the National Priorities List ("NPL") in September, 1984.

The United States Environmental Protection Agency ("E.P.A.") issued a Record of Decision ("ROD I") on September 30, 1986. This document considered a range of options for dealing with the site. It settled on excavating areas one and four and incinerating the contents at an off-site incinerator. The reason for incinerating off-site was that the length of time to obtain Michigan permitting requirements would delay the remedy by two years. Remedial action commenced in March, 1988.

Over 24,000 drums were excavated from areas one and four, and the contents of 10,-000 drums were incinerated off-site, primarily in Dee Park, Texas. As a result of a shortage of incinerators, however, and of federal restrictions governing incineration, *see* 40 C.F.R. part 264, subpart O, incinerator prices sharply increased. Furthermore, additional drums and thousands of tons of contaminated soil were discovered and stacked at Metamora.

A new remedial investigation and feasibility study was started to address the problem. These studies found groundwater contamination and seeps of leachate around the landfill and detection of contaminated soil. Plaintiff's Ex. 5, ROD II, 4–5, Tables 1, 2. EPA published notice of the completion of these studies, solicited public comment, and held a meeting in the nearby village to receive comments from the public. Consent Decree at 2. EPA then issued a second Record of Decision ("ROD II") on September 28, 1990. This ROD considered seven alternatives for dealing with the Site and three for dealing with the Landfill contents. EPA evaluated the choices for cleanup according to the criteria in the National Contingency Plan (NCP), 40 CFR § 300.430(e)(9)(iii). Plaintiff's Ex. 5, Rod II Summary 15–20.

EPA chose to install and operate a network of groundwater extraction wells; treat the extracted groundwater by precipitation/flocculation, air stripping, and recharge back into the shallow aquifer; and monitor for detection of hazardous substances. For the landfill, EPA chose to cover the landfill with a clay covering; install an on-site gas collection system; and build an on-site incinerator. *Id.* at 19–20. Because of the SARA amendments, EPA no longer needed to obtain permit approval for the on-site landfill. 42 U.S.C. § 9621(e)(1).

EPA found that this remedy met the requirements of CERCLA: that is, protects human health and the environment, attains all ARARS[2]; is cost effective; utilizes permanent solutions and alternative treatment technologies to the maximum extent practicable, and satisfies CERCLA's preference for remedies that employ treatment that reduces toxicity, mobility or volume as a principal element. Plaintiff's Ex. 5, ROD II at 2; ROD II Summary at 21–24. EPA estimated the capital cost at $7.95 million, and the total present value of the remedy at $19.4 million. *Id.* at 20.

EPA then notified potentially responsible parties ("PRPs") and invited them to submit a proposed remedial action. EPA and the thirty-five settling defendants reached an agreement for defendant to perform the ROD II remedy. Attached to the Consent

---

2. Applicable or Relevant and Appropriate Requirements: federal or state environmental requirements that are applicable to a proposed remedy. *See* 42 U.S.C. § 9621(d)(2). The ARARs are discussed at Plaintiff's Ex. 6, ESD, at 6–7.

Decree is a Scope of Work ("SOW") which outlines the basic features of the clean-up project for which the settling defendants have agreed to pay. The SOW specifically required that this on-site incinerator destroy 99.99% of principal organic hazardous waste and 99.9999% of PCBs. The SOW also requires that the incinerator must comply with the substantive requirements of applicable statutes and regulations, including emissions requirements from the federal Clean Air Act and Michigan air pollution laws. The SOW actually goes beyond ROD II in that it includes remediation of residual, contaminated soil at the Site in accordance with an EPA selected remedial action. At least 22 vendors exist for on-site incineration and about 50 other Superfund sites currently use on-site incineration. Plaintiff's Ex. 6, at 6.

Under the Consent Decree, EPA reviews the remedial action every five years in accordance with CERCLA, 42 U.S.C. § 9621(c), to assure that human health and the environment are being protected, and EPA may act with additional enforcement if necessary. Consent Decree ¶ 19.

Paragraph 64 of the Consent Decree specifically excludes from the agreement of the United States not to sue the defendants, the reimbursement of the Government's past response costs at the Site.

After the Consent Decree was lodged with the Court on July 18, 1991, the U.S. published a notice of settlement and solicited public comment for 30 days, 56 Fed.Reg. 36845 (Aug. 1, 1991), which was renewed for another thirty days. EPA published an Explanation of Significant Differences ("ESD") in the Lapeer County Press on September 4, 1991. EPA also held two public meetings in August–September 1991, in Metamora. Plaintiff's Ex. 6, ESD, at 8.

Over fifty comments have been filed opposing the consent decree. EPA has filed a Reply to Comments at Appendix A to the Memorandum Brief of the United States in Support of Motion for Entry of Proposed Consent Decree.

### Citizens United's Motion to Intervene

The motion to intervene has been brought by Citizens United ("CU") in order to oppose the proposed remedy in the Consent Decree. This motion is subject to Fed.R.Civ.P. 24. To intervene, a motion must be raised in a timely fashion. *Stotts v. Memphis Fire Dept*, 679 F.2d 579, 582 (6th Cir.1982) *cert. denied*, 459 U.S. 969, 103 S.Ct. 297, 74 L.Ed.2d 280 (1983); Fed.R.Civ.P. 24 ("(a) Intervention of Right. Upon timely application...." "(b) Permissive Intervention. Upon timely application....").

■ The Sixth Circuit has identified five factors that are "particularly probative" in determining whether intervention is timely: (1) the purpose for which intervention is sought; (2) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (3) prejudice to the original parties; (4) unusual circumstances militating in either direction; (5) the point to which the suit has progressed. *Stotts* at *Id.*

■ A review of these factors indicate that intervention cannot be considered timely. First, CU's purpose for intervening is to promote the health of its members by noting objections to the proposed clean-up. However, CU is able to express its views regarding the consent decree without being a party due to its submitted comments. *Bloomington v. Westinghouse Elec. Corp.*, 824 F.2d 531, 534 (7th Cir.1987). Therefore, its stated purpose for intervention does not strengthen its case for intervention.

Moreover, CU contends that the existing parties do not adequately represent its interests. There is admittedly some divergence of interests between the would-be intervenors and Plaintiff. The national interest in cleaning up Superfund sites according to the NCP criteria is almost certainly not *identical* to the concerns of the Metamora neighbors of the Site. *See e.g., Assessment of Incineration as a Treatment Method for Liquid Organic Hazardous Wastes:* Summary and Conclusions (E.P.A. Office of Policy, Planning and Evaluation March, 1985) at § 5. "Public Acceptability of Risks", Defendant's Ex. 19, App. 25.

For instance, the public often wishes to reduce risks *completely;*[3] whereas, E.P.A. finds a low level of risk to be acceptable. *Id.; Hazardous Waste Incineration: Questions and Answers,* Defendant's Ex. 19, App. 19 at 41 ("Reasonable, worst-case estimates of health risks posed by metals and organic compounds in emissions for a permitted hazardous waste incinerator range from one chance in 100,000 to one chance in 100,000,000 of contracting cancer over a lifetime. These conservative estimates assume 70 years of continuous exposure at the point where pollutant concentrations would be the highest.").

Nonetheless, Congress enacted CERCLA to protect the health of citizens and to act in the public interest. *See* H.Rep. 96–1016, Part I, 17 *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120 (1980) (CERCLA legislative history). It is not altogether clear exactly how the private interests of CU differs from the public interest, and "a prospective intervenor that basically asserts the public interest faces a presumption that the state's representation of the public interest will be adequate." *United Nuclear Corp. v. Cannon,* 696 F.2d 141, 144 (1st. Cir.1982) *citing Pennsylvania v. Rizzo,* 530 F.2d 501, 505 (3d Cir.) *cert. denied,* 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976); 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1909, at 525–529 (1972).

This similarity of interests between CU and Plaintiff is reflected in the nature of CU's stated objections to the Consent Decree. The objections of CU to the Consent Decree concern both procedural and substantive matters. The procedural objections address primarily issues of public involvement in the formulation of the plan. *See infra.* The substantive matters address the technical basis for the scientific conclusions made by the Government. *See e.g.,* Affidavit of Stuart A. Batterman, Assistant Professor of Environmental Health Sciences at the School of Public Health, University of Michigan, appended to CU's Motion to Intervene; Professor Batterman's Comments at 3–10, Plaintiff's Motion for Entry of Consent Decree, Attachment B, Ex. 4. CU's interests with regard to its substantive objections therefore are · represented in large measure by the Government, with whom it may disagree as to method, but not substantially as to the ultimate outcome.

CU's interests regarding its procedural objections do differ from the Government's interests; however, the Court finds that they are adequately addressed from its current position as a submitter of comments.

Second, CU has waited too long prior to seeking intervention in this case. CU has participated in this case as a non-party for several years. *United States v. Mid–State Disposal, Inc.,* 131 F.R.D. 573, 576 (W.D.Wis. 1990). CU waited over a year after the Consent Decree was lodged with the Court to propose intervention. The Court finds that CU should have intervened after the lodging of the consent decree; for it was at that point that CU's differences with the Government's method of clean-up became clear or should have become clear to CU.

Even were the Court to accept CU's claim that the reasonable time to examine for this purpose is the period following the Government's Motion for Entry of the Consent Decree, CU waited too long. CU waited almost five months to seek intervention following the Government's motion for entry. While CU claims that "[i]n the context of this case, this is an insignificant, even trivial period," the Court cannot agree. Precisely because this case has taken so many years to complete, and the Government's motion constitutes the final phase of litigation, CU should have acted promptly to intervene.

CU could have prepared the motion in anticipation of the rejection of its demands by the Attorney General. Alternatively, CU

---

**3.** *See e.g.,* Ex. 2 of Attachment B, Plaintiff's Brief in Support of Motion for Entry of the Metamora Consent Decree (Letter from Ronald A. Barnard of Metamora to the Court noting, "We should not be placed at *any* risk to our health."). *Compare* Plaintiff's Attachment B, Ex. 3 at 1 (Letter of Dean Bedford, Jr., self-described "downwind" property owner, 3.6 miles from the Site who asks, "Does the plan of action ... contained in the settlement dispose of the hazardous waste material in the most expeditious, complete and efficient manner with minimum risk to a minimum number of people?").

could (and should) have prepared this motion, which is on a simple procedural issue, within a few weeks following the Government's motion. Thus, the Court finds that CU did not file promptly. Had CU determined that its interests diverged from the Government's at the date the consent decree was first lodged, a delay of five months would not have been fatal, because a lengthy process remained prior to the Government's motion for entry. At the final juncture in the case, however, the motion came too late.

Third, the parties will suffer prejudicial delay resulting from the intervention which, naturally, will seek to reexamine issues previously settled in formulating the consent decree. *United Nuclear Corp. v. Cannon,* 696 F.2d 141, 143 (1st Cir.1982). This delay could result not only in re-negotiating the terms of the remediation, but in conducting the clean-up. After all, CU opposes on-site incineration. If it was successful in this position, none of the thousands of drums containing hazardous substances could be destroyed until EPA conducted a new study resulting in an alternative clean-up plan. Judging from the record in this case, that would take more than one year, and possibly three or four years. In the meantime, the drums would remain at the landfill, vulnerable to environmental or man-made pitfalls. This time lag constitutes prejudicial delay. Conversely, CU cannot claim prejudice for its lack of presence in the litigation, because it is able to express its views completely through the comment process, *see infra.*

Fourth, the Court finds that exceptional circumstances militate against intervention: the ability of CU to express its views absent intervention makes intervention inappropriate. Unlike most would-be intervenors, CU has submitted briefs and technical appendices for the Court's consideration in the motion for entry of the consent decree. The comment process provides an unusual degree of participation that obviates the need for participation as a party in the litigation. The Court is free to evaluate from the briefs the reasonableness of CU's procedural and substantive complaints.

Finally, the status of the litigation favors denial of intervention. "The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *United States v. South Bend Community School Corp.,* 710 F.2d 394, 396 (7th Cir.1983). The CU intervention comes during the final phase of this case.

Therefore, all five factors that this Court must examine suggest that the application for intervention is untimely.

The Court bears in mind that the risk of denying intervention is to "promote a sort of prophylactic intervention whereby parties would be compelled to intervene in matters simply to protect their rights to participate in those matters downstream on the more remote chance that a party apparently protecting intervenors' interests might someday betray them. Such a result would obviously be expensive and inefficient." *In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 1019, 1023–24 (D.Mass.1989), *later proceedings, sub. nom. U.S. v. AVX Corp.,* 962 F.2d 108 (1st Cir.1992).

However, the Court believes that there is a competing policy at work: the rapid settlement of extraordinarily lengthy and expensive CERCLA litigation. *Acushnet,* 712 F.Supp. at 1027 and n. 13. " 'Costly protracted litigation threatens the effectiveness of the Superfund Program and consumes resources better spent on cleanup.' " *Id.* (*quoting* 132 Cong.Rec. H9564 (daily ed. Oct. 8, 1986) (Statement of Rep.Lent)). CU has been at the side of this cauldron of litigation for years, continuously asking for tastes, but never serving as chef. Now that the soup is just about to be served, CU wants to change the recipe. While the Court is not unsympathetic to the plight of CU, which was undoubtedly forced to make difficult judgments balancing the expense of early intervention with the risk of being kept out, that sympathy does not sway the Court in its application of the *Stotts* test.

Moreover, the Court does not predict that this opinion will encourage early intervention in CERCLA cases; that choice entails great expense. Rather, it will encourage prospec-

tive intervenors to intervene once consent decrees have been lodged.

The Motion to intervene is DENIED.

## MOTION TO ACCEPT CONSENT DECREE

The Court next considers the motion by the U.S. and by the settling defendants to accept the consent decree.

### I. Standard of Review

■ In this Circuit, the 3–prong standard of review by a district court of a proposed CERCLA consent decree is whether it is fair, reasonable and consistent with the goals of CERCLA. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1424 (1991); H.R.Rep. No. 253, Part 3, 99th Cong. 1st Sess. 19 (1985). In evaluating the decree, the Court must bear in mind that "[j]udicial approval ... places the power and prestige of the Court behind the compromise struck by the parties" *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir.1983), and that protection of the public interest is paramount. *Acushnet River & New Bedford Harbor Proceedings*, 712 F.Supp. at 1027.

■ On the other hand, "The court may either approve or disapprove the settlement; it may not rewrite it." *Harris v. Pernsley*, 654 F.Supp. 1042, 1049 (E.D.Pa.1987), *aff'd*, 820 F.2d 592 (3d Cir.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987). Significantly, the Sixth Circuit has held, "In evaluating the decree, it is not our function to determine whether this is the best possible settlement that could have been obtained, but only whether it is fair, adequate and reasonable," *Akzo Coatings*, 949 F.2d at 1436, and that the presumption in favor of government-negotiated settlements "is particularly strong where a consent decree has been negotiated by the Department

of Justice on behalf of a federal administrative agency like EPA which enjoys the substantial expertise in the environmental field." *Id.*, at 1436.

"A reviewing court should not attempt to substitute its judgment for the expertise of EPA officials. Ours is the task of searching for errors of procedure, and serious omissions of substantive evidence, not the job of reformulating a scientific clean-up program developed over the course of months or years." *Id.*, at 1425. (footnote omitted).

■ In addition, the Court must employ the arbitrary and capricious standard of review found at 42 U.S.C. § 9613(j)(2).[4] The parties claim that this settlement was made pursuant to the requirements 42 U.S.C. § 9622.

### II. Application of the Standard

#### A. *Fairness*

Both EPA and the settling defendants claim that the settlement was reached after arms-length negotiation. EPA estimates that remediation, to be paid by the settling defendants, will cost approximately $50 million. Various commentators suggest that the settlement is unfair, primarily because the process by which the ROD II altered the remediation plan is inconsistent with the due process requirements imposed by CERCLA. Other courts have treated fairness primarily in terms of procedural fairness, *see e.g.*, *United States v. Cannons Engineering Corp.*, 899 F.2d 79 at 86 (1st Cir.1990); therefore, this prong of the analysis should address the concerns of commentators in regard to the process by which this agreement was reached.

EPA employed a substantial factual record prior to entertaining negotiations on the con-

---

**4.** The *Akzo* Court found that both standards should be employed. *Akzo*, 949 F.2d at 1426. It seems somewhat clear, however, that the three prong standard is a higher standard than the arbitrary and capricious standard. Arbitrary and capricious might well be defined as "unreasonable." But "fairness" requires more than the absence of unreasonableness. It certainly suggests some sort of analysis of equities that goes beyond, for example, the allowed standard of review of state legislation in fourteenth amendment due process cases. *See e.g., Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Moreover, consistency with CERCLA's goals also suggests more substantive review than the absence of unreasonableness. Finally, there would be no need for a three prong test if all three prongs presented the same hurdle of arbitrariness.

sent decree: ROD I, the 1989–90 RI/FS,[5] and ROD II. Several commentators contend however that EPA erred in failing to amend ROD I rather than publish an ESD on September 4, 1991. They point out that the ESD was issued following negotiations between the parties. While this is true, EPA also delayed in issuing the ESD until after it had solicited comments from the public.

■ As all parties and commentators appear to acknowledge, the test that this Court must apply as to whether an amendment to the ROD is required is whether the changes in the remedial action "fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost" selected in the ROD. 40 C.F.R. § 300.-435(c)(2).[6]

■ The most significant change that resulted from the new negotiations was the choice to conduct on-site incineration as opposed to off-site incineration. Several commentators contend that it is difficult to describe this change as anything other than "fundamental." *See e.g.*, Public Comment in Opposition to Proposed Consent Decree Submitted by the Township of Metamora ("Township Comments") at 48–51.[7] From the perspective of a resident of Metamora, the incineration of the material on-site clearly constitutes a significant change. Under the previous plan, the hazardous substances were to go somewhere else for incineration. Now, they are burned locally. Clearly, this prospect raises new hazards for the community, such as an explosion at the incinerator, or the possibility that carcinogenic ash could be released.

On the other hand, the dangers of transporting the materials, which presumably previously existed, is vastly reduced. Plaintiff's Motion, Attachment A at 30 (Response to Comment 47).

The Court must apply the "fundamental change" language in the way that it was drafted. The last three key words, "cost", "performance" and "scope" provide the only basis by which EPA considers whether a "basic feature" of a clean-up is "fundamentally altered." The incineration obviously constitutes a "basic feature" of the clean-up.

There is no evidence in the record that cost estimates have been fundamentally altered by the change in remedial action plans. Rather, the cost estimates were rapidly increasing by maintaining the original clean-up plan. *See* Defendant's Ex. 6 (Petition to Reopen 1986 Record of Decision). The Court must therefore decide whether changing the location of the incineration fundamentally alters the *performance* or *scope* of a basic feature of the cleanup. The change in site, by itself, does not result in differing amounts of material being incinerated. Thus, *scope* is not implicated. Nor are the standards of compliance with the federal ARARs altered by the change in location: the 99.99% and 99.9999% rates for destruction of hazardous materials remain constant. Therefore, *performance* is not fundamentally altered. Finally, ROD I specifically stated that "Disposal of the material will depend on the availability of RCRA complaint facilities." ROD I, Plaintiff's Ex. 2 at 1. That document indicated that limited availability may require revisions. Therefore, the ESD's announcement changing from off-site to on-site

---

**5.** remedial investigation/feasibility study

**6.** This provision reads as follows:

After the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall ... remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall ... (i) Publish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent de-

cree significantly change but do not fundamental alter the remedy selected in the ROD with respect to scope, performance, or cost.... (ii) Propose an amendment to the ROD if the difference in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost.

40 C.F.R. § 300.435(c)(2) (1991).

**7.** This comment was endorsed by the County of Lapeer, the Village of Metamora, and the Metamora Concerned Citizens Association. Township Comments 61.

therefore did not require an amendment of ROD I.

■ Commentators have also argued that the decision only to excavate and incinerate the drums in areas 1 and 4 constituted another "fundamental change" in ROD II. *See* Township Comments at 18 (suggesting that possibly EPA has arbitrarily decided not to investigate Areas 2, 3, and 5). However, ROD I, issued in 1986, also called only for the excavation of areas 1 and 4. ROD I, Plaintiff's Ex. 2. at 1.

EPA made this decision, based on the recommendation of the consulting firm that performed the RI/FS, that it would be more dangerous to perform excavation of the other areas than to cap the landfill, while leaving open the possibility of additional clean-up activities if leakage to the environment occurs. Plaintiff's Motion, Attachment A, 40–41 (Response to Comments 65–67); *see also,* Plaintiff's Ex. 12 (EPA Guidance recommending limiting excavation of municipal landfills to "hot spots" or to small landfills containing less than 100,100 cubic yards of contaminated soil). Metamora contains an estimated 1–1.5 million cubic yards. Finally, excavation of all waste at Metamora was estimated to cost $200 million. Plaintiff's Ex. 4, FS, Table 4–5.

Significantly, commentators can show no prejudice from EPA's decision to treat the change in clean-up plan as requiring an ESD rather than amending an ROD. In fact, EPA performed all of the major steps required to amend a ROD: the agency issued a notice in major steps required to amend a ROD: the agency issued a notice in the newspaper; they held 60 days open for comments; they held two public meetings; and issued a fact sheet.

None of the other comments regarding procedural fairness warrant additional discussion by the Court. The Court directs the reader to Plaintiff's Appendix B, which provides the Government's response to comments, as sufficiently responding to all other issues.

Therefore, all comments regarding the fairness of the plan are rejected.

## B. *Reasonable*

■ The Consent Decree is a comprehensive document of 85 paragraphs. It is supplemented by a highly detailed SOW. The settling defendants have agreed to adhere to all the requirements in both the consent decree and the scope of work. Moreover, if the SOW proves insufficient to perform the clean-up activities in conformance with the Government's requirements, the Government is explicitly authorized under the Consent Decree ¶¶ 15–17 (¶ numbers refer to Consent Decree) to proceed against the settling defendants to obtain additional clean-up efforts.

EPA shall monitor the clean-up activities under ¶ 13 and must authorize all changes. ¶ 14. EPA shall also conduct periodic reviews ¶¶ 19–20. ¶¶ 38–44 provide for a dispute resolution system, with an EPA official resolving all disputes, subject to a limited period of judicial review for twenty business days following the EPA decision if the defendants are not satisfied. ¶ 40(e). ¶¶ 52–63 provide for stipulated penalties should the defendants fail to comply with deadlines for achieving goals. Furthermore, settling defendants may not raise the defense of impracticability to the groundwater extraction system for at least ten years. ¶ 12. All of these provisions suggest that compliance will occur.

¶ 64 provides a covenant to protect the settling defendants against suit by the United States. This paragraph specifically excludes the following matters:

a. liability arising from hazardous substances removed from the Facility;

b. natural resource damages;

c. criminal liability

d. Claims based on a failure by the Settling Defendants to meet the requirements of this Consent Decree;

e. Any matter for which the United States is owed indemnification under Section XIX hereof [Section XIX (¶¶ 71–73) specifies terms of indemnification];

f. Liability for violations of Federal law which occur during implementation of the remedial action.

g. Liability for performance of remedial design or remedial action at the Facility other than the Work required hereunder. h. Liability for reimbursement to the United States for any response costs other than those paid hereunder, including without limitation, any response costs incurred prior to the entry of this Consent Decree.

Consent Decree ¶ 64.

Most importantly, ¶ 65 specifically reserves the Government the right to proceed against the settling defendants during or after completion of the work at Metamora or to seek an order compelling them to perform additional response work if previously unknown conditions are discovered indicating that the "the remedial action is not protective of human health and the environment; ..."

Thus, it is readily apparent that the Government has not relinquished its rights by entering into the decree in a haphazard or unreasonable fashion. Rather, the Government has reserved itself considerable rights to ensure that the goals of cleaning the site will be accomplished. For these reasons, the Court finds that the "decree is carefully structured so as to ensure the protection of human health and the environment, ..." *Akzo*, 949 F.2d at 1437, and consistent with the requirements of 42 U.S.C. §§ 9621 and 9622.

The Court finds the Consent Decree is reasonable.

### C. *Consistent With the Goals of CERCLA*

¶ 77 states that the United States finds that the work performed under the Consent Decree is consistent with CERCLA and the NCP. The Court must decide whether this finding is warranted.

All remedial action at the Site must meet all substantive federal and state environmental requirements. Plaintiff's Motion, Attachment A at 21–22 (Response to Comment # 33). The Consent Decree provides for a cleanup of the Site by PRPs at the expense of the Defendants, thereby preserving the Superfund for use at other sites. The remedy was selected in accordance with CERCLA's procedural requirements. The settlement also furthers the public policy favoring voluntary settlement without expensive litigation.

Hundreds of pages of comments were submitted suggesting that CERCLA was violated by the adoption of the Consent Decree. Some of these comments have already been addressed. The Court believes that a discussion of two more of them is warranted in this section of the opinion.

The De Minimis PRPs have not entered into the settlement, and they request that the Court not enter the settlement until they are included pursuant to 42 U.S.C. § 9622(g). Plaintiff notes that these companies did not approach EPA until after the statutorily limited period of 120 days had expired following the issuance of the PRP notice letters. 42 U.S.C. § 9622(e)(2). This argument is dispositive in favor of the Government. While the United States raises additional arguments on this point, *see* Plaintiff's Brief in Support of Motion for Entry of Consent Decree 43–44, they are not necessary to address.

Several comments express concerns with the plans to address groundwater contamination. *See e.g.*, Comments 61–62, and Responses, found at Attachment A 36–38. These comments ignore that EPA is following the recommendation of the FS, as to the particular remedial action provided for, and that the Consent Decree provides mechanisms by which EPA can require additional technologies if necessary to achieve the performance and cleanup standards selected for the site. Attachment A at 37 (Response to Comment 61 and sources cited therein).

As to the remaining comments, they have been adequately answered by the responses found in Attachment A. Finally, the Court wishes to state that the record provided by the Government has been extremely thorough and well-argued: in particular, the Court wishes to single out the Response to Comments (Attachment A) which was prepared by EPA as unusually helpful.

The Motion to Enter the Consent Decree is GRANTED.

SO ORDERED.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | PURPOSE OF DECREE | 614 |
| II. | JURISDICTION | 614 |
| III. | PARTIES BOUND | 614 |
| IV. | DEFINITIONS | 614 |
| V. | GENERAL PROVISIONS | 615 |
| VI. | PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS | 616 |
| VII. | ADDITIONAL WORK AND MODIFICATION OF THE SOW | 618 |
| VIII. | U.S. EPA PERIODIC REVIEW TO ASSURE PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT | 619 |
| IX. | QUALITY ASSURANCE | 619 |
| X. | FACILITY ACCESS, SAMPLING, DOCUMENT AVAILABILITY | 620 |
| XI. | REPORTING REQUIREMENTS | 620 |
| XII. | REMEDIAL PROJECT MANAGER/PROJECT COORDINATORS | 621 |
| XIII. | FORCE MAJEURE | 621 |
| XIV. | DISPUTE RESOLUTION | 622 |
| XV. | RETENTION AND AVAILABILITY OF INFORMATION | 623 |
| XVI. | REIMBURSEMENT | 624 |
| XVII. | STIPULATED PENALTIES | 624 |
| XVIII. | COVENANT NOT TO SUE; CONTRIBUTION PROTECTION | 627 |
| XIX. | INDEMNIFICATION; OTHER CLAIMS | 628 |
| XX. | INSURANCE/FINANCIAL RESPONSIBILITY | 629 |
| XXI. | NOTICES | 629 |
| XXII. | CONSISTENCY WITH NATIONAL CONTINGENCY PLAN | 629 |
| XXIII. | ENDANGERMENT AND EMERGENCY RESPONSE | 630 |
| XXIV. | COMMUNITY RELATIONS | 630 |
| XXV. | RETENTION OF JURISDICTION; MODIFICATION | 630 |
| XXVI. | EFFECTIVE DATE AND CERTIFICATION OF COMPLETION OF REMEDY | 630 |

APPENDIX

### CONSENT DECREE

**WHEREAS,** The United States Environmental Protection Agency ("U.S. EPA"), pursuant to Section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9605, placed the Metamora Landfill in Lapeer County, Michigan (the "Facility" as specifically defined in Paragraph 4 of this Consent Decree) on the National Priorities List, which is set forth at 40 CFR Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed.Reg. 37066 (September 21, 1984);

In response to a release or a substantial threat of a release of a hazardous substance at or from the Facility, the U.S. EPA in February, 1986, completed a Site Characterization Report for the Facility;

U.S. EPA completed a Phased Feasibility Study for the Facility in August, 1986;

Based upon the Site Characterization Report and the Phased Feasibility Study, U.S. EPA reached a decision on a remedial action plan for areas 1 and 4 of the Facility, and on September 30, 1986, signed a Record of Decision for Areas 1 and 4 of the Facility; (attached as Appendix 1 hereto)

The U.S. EPA in October, 1986 commenced a Remedial Investigation and Feasibility Study ("RIFS") pursuant to 40 CFR 300.68 for the Facility;

U.S. EPA completed a Remedial Investigation ("RI") Report in March, 1989, and completed a Feasibility Study ("FS") Report in March, 1990;

The FS Report contained a proposed plan for remedial action at the Facility;

On or about July 12, 1990, U.S. EPA, pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, published notice of the completion of the RIFS and of the proposed plan for remedial action, in a major local newspaper of general circulation and provided opportunity for public comment to be submitted in writing to U.S. EPA by August 28, 1990 or orally at a public meeting held in the City of Metamora, Michigan, on August 1, 1990;

U.S. EPA, pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, has kept a transcript of the public meeting and has made this transcript available to the public as part of the administrative record located at U.S. EPA, Region V, 230 South Dearborn Street, Chicago, Illinois and at Lapeer Library, Metamora Branch, 4042 Oak Street, Metamora, Michigan.

On November 9, 1990, and dates subsequent thereto, U.S. EPA, pursuant to Section 122 of CERCLA, 42 U.S.C. § 9622, notified certain parties that the U.S. EPA determined each party to be a potentially responsible party ("PRP") regarding the proposed remedial action at the Facility;

In accordance with Section 121(f)(1)(F) of CERCLA, 42 U.S.C. Section 9621(f)(1)(F), U.S. EPA notified the State of Michigan on November 9, 1990 of negotiations with PRPs regarding the scope of the remedial design and remedial action for the Facility, and U.S. has provided the State with an opportunity to participate in such negotiations and be a party to any settlement;

Pursuant to Section 122(j) of CERCLA, 42 U.S.C. § 9622(j), on November 9, 1990 U.S. EPA notified the Federal natural resource trustee of negotiations with PRPs on the subject of addressing the release or threatened release of hazardous substances at the Facility;

Certain persons have provided comments on U.S. EPA's proposed plan for remedial action, and to such comments U.S. EPA provided a summary of responses, all of which have been included in the administrative record referred to above;

Considering the proposed plan for remedial action and the public comments received, U.S. EPA has reached a decision on a final remedial action plan, which is embodied in a document called a Record of Decision ("ROD") signed by the Regional Administrator on September 28, 1990, (attached as Appendix 1 hereto), to which the State has given its concurrence, and which includes a discussion of U.S. EPA's reasons for the final plan and for any significant changes from the proposed remedial action plan contained in the FS;

U.S. EPA, pursuant to Section 117(b) of CERCLA, 42 U.S.C. § 6917(b), has provided public notice of adoption of the final remedial action plan set forth in the ROD, including notice of the ROD's availability to the public for review in the same locations as the administrative record referred to above;

Pursuant to Section 117(d) of CERCLA, 42 U.S.C. [§]9617(d), the notice has been published in a major local newspaper of general circulation, and the notice includes an explanation of any significant changes from the proposed remedial action plan contained in the FS and the reasons for such changes;

Pursuant to Section 121(d)(1) of CERCLA, 42 U.S.C. § 6921(d)(1), U.S. EPA, and Settling Defendants ("the Parties") believe that the remedial action plans adopted by U.S. EPA will attain a degree of cleanup of hazardous substances, pollutants and contaminants released into the environment and of control of further release which at a minimum assures protection of human health and the environment at the Facility;

The Parties believe the remedial action plans adopted by U.S. EPA and the attached Scope of Work ("SOW") as set forth in Appendix 2 will provide a level or standard of control for such hazardous substances, pollu-

tants, or contaminants which at least attains legally applicable or relevant and appropriate standards, requirements, criteria, or limitations under Federal environmental law or State environmental or facility citing law in accordance with Section 121(d)(2) of CERCLA, 42 U.S.C. § 9621(d)(2), and that the remedial action plans and SOW are in accordance with Section 121 of CERCLA, 42 U.S.C. § 9621, and with the National Contingency Plan ("NCP"), 40 CFR Part 300;

Settling Defendants agree to implement the final remedial action plans adopted by U.S. EPA in the manner described in the SOW as set forth in Appendix 2 to this Consent Decree and incorporated by reference into this Decree, and U.S. EPA has determined that the work required under the Consent Decree will be done properly by Settling Defendants and that Settling Defendants are qualified to implement the remedial action plans in the manner described in the SOW; and

The Parties recognize, and intend to further hereby, the public interest in the expedition of the cleanup of the Facility and in avoiding prolonged and complicated litigation between the Parties;

NOW, THEREFORE, it is hereby Ordered, Adjudged and Decreed:

## I. PURPOSE OF DECREE

1. The purpose of this Consent Decree is to provide for implementation by Settling Defendants of the final remedial design and remedial action for this Facility selected by U.S. EPA, as set forth in the Records of Decision in the manner described in the SOW attached as Appendix 2, and to provide for payment of certain response costs to be incurred by the United States for the Facility after execution of this Consent Decree by the Settling Defendants.

## II. JURISDICTION

2. This Court has jurisdiction over the subject matter herein pursuant to 28 U.S.C. §§ 1331(a) and 1345, and 42 U.S.C. §§ 9613(b) and 9622(d)(1)(A), and over the parties consenting hereto. Settling Defen-

dants hereby waive service of the summons and complaint in this action.

## III. PARTIES BOUND

3. This Consent Decree applies to and is binding upon the undersigned parties and their successors and assigns. It shall not be a defense to this Consent Decree that an agent of any Settling Defendant violated any term or condition of this Consent Decree. The undersigned representative of each party to this Consent Decree certifies that he or she is fully authorized by the party or parties whom she or he represents to enter into the terms and conditions of the Consent Decree and to execute and legally bind that party to it. Settling Defendants shall provide a copy of this Consent Decree to the contractor(s) hired to perform the work required by this Consent Decree and shall require the contractor(s) to provide written notice of the decree to any subcontractor retained to perform any part of the work.

## IV. DEFINITIONS

4. Whenever the following terms are used in this Consent Decree and the Appendices attached hereto, the following definitions shall apply:

"Cleanup and Performance Standards" means the: requirements respecting the degree of cleanup of groundwater, surface water, soil, air or other environmental media that must be achieved by the remedial action, as set forth in the RODs, in the manner described in the SOW, paragraph 12 of this Decree, and the SOW.

"Consent Decree" means this Decree and all appendices hereto. In the event of conflict between this Decree and any appendix, the Decree shall control.

"Contractor" means the company or companies retained by or on behalf of Settling Defendants to undertake and complete the work required by this Consent Decree. Each contractor and subcontractor shall be qualified to do those portions of the work for which it is retained. Each contractor and subcontractor shall be deemed to be related by contract to each Settling Defendant within the meaning of 42 U.S.C. § 9607(b).

"Facility" refers to the location where treatment, storage, disposal or other placement of hazardous substances was conducted by Metamora Landfill, Inc., which facility is located at 1717 Dryden Road, in Lapeer County, State of Michigan, including all of the areas shown more particularly on the map attached as Appendix 3.

"Future liability" refers to liability arising after U.S. EPA's Certification of Completion is issued pursuant to Section XXVI hereof.

"Hazardous substance" shall have the meaning provided in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

"National Contingency Plan" or "NCP" means the term used in Section 105 of CERCLA, 42 U.S.C. § 9605 and is promulgated at 40 CFR Part 300.

"Oversight Costs" means any costs not inconsistent with the National Contingency Plan incurred by U.S. EPA in monitoring the compliance of the Settling Defendants with this Consent Decree, including but not limited to payroll and other direct costs, indirect and overhead costs, sampling and laboratory costs, travel, contractor costs and costs of review of the work performed pursuant to this Consent Decree.

"Parties" means the United States of America, and the Settling Defendants.

"RD/RA Work Plan" means the plan for the design, construction and implementation of the remedial action for the Facility.

"Record of Decision" or "ROD" means the administrative Records of Decision issued by U.S. EPA on September 30, 1986, and September 28, 1990, setting forth the remedial action requirements for the Facility, attached as Appendix 1 hereto.

"Remedial Project Manager" or "RPM" means the person designated by U.S. EPA to coordinate, monitor or direct remedial activities at the Facility pursuant to 40 CFR 300.33 and Section XII hereof.

"Response Costs" means any costs not inconsistent with the NCP incurred by the United States pursuant to 42 U.S.C. §§ 9601 *et seq.* and any costs which are necessary and consistent with the NCP incurred by any other party.

"Scope of Work" or "SOW" means the plan, set forth as Appendix 2 to this Decree, for implementation of the remedial design and remedial action at the Facility pursuant to the Records of Decision, and any subsequent amendments of Appendix 2 pursuant to the provisions of this Decree.

"Settling Defendants" means those parties other than the United States of America who sign this Consent Decree.

"State" means the State of Michigan; "MDNR" means the State's environmental protection agency.

"United States" means the United States of America.

"U.S. EPA" means the United States Environmental Protection Agency.

"U.S. DOJ" means the United States Department of Justice.

"Work" means the design, construction and implementation, in accordance with this Consent Decree, of the tasks described in this Decree, the RODs, in the manner described in the SOW, the Work Plan(s), and any other plans or schedules submitted and approved by U.S. EPA pursuant to this Decree or the SOW.

## V.  GENERAL PROVISIONS

5.  *Commitment of Settling Defendants to Perform RD/RA.*

a.  Settling Defendants agree jointly and severally to finance and perform the Work as defined in paragraph 4 hereof.

b.  The Work shall be completed in accordance with all requirements of this Decree, the RODs in the manner described in the SOW, the RD/RA Work Plan and all other plans or schedules submitted and approved by U.S. EPA under this Decree.  The procedures for submission and approval of plans are set forth in Section VI below.

6.  *Compliance with Applicable Laws; Permits and Approvals*

a.  All activities undertaken by the Settling Defendants pursuant to this Consent Decree shall be undertaken in accordance

with the requirements of all applicable federal and state laws, regulations and permits, as required by CERCLA.

b. Pursuant to Section 121(e)(1) of CERCLA, no federal, state, or local permits are required for work conducted entirely on the Facility. Settling Defendants shall obtain all permits or approvals necessary for work off the Facility under applicable federal, state or local laws and shall submit timely applications and requests for any such permits and approvals.

c. The standards and provisions of Section XIII hereof describing *Force Majeure* shall govern delays in obtaining permits required for the Work and also the denial of any such permits, provided that Settling Defendants have made timely and complete application for any such permits.

d. Settling Defendants shall include in all contracts or subcontracts entered into for work required under this Consent Decree, provisions stating that such contractors or subcontractors, including their agents and employees, shall perform all activities required by such contracts or subcontracts in compliance with all applicable laws and regulations.

e. This Consent Decree is not a permit issued pursuant to any federal or state statute or regulation.

7. *Formal Approval Required.* No informal advice, guidance, suggestions or comments by representatives of the United States or the State on plans, reports or other documents submitted by the Settling Defendants shall be construed as relieving them from obtaining any formal approvals, permits or other authorizations required by law or by this Decree. Further, no advice, guidance, suggestions or comments by such government representatives with respect to any submission by the Settling Defendants shall be construed so as to relieve them of their obligations under this Decree or to transfer any of their liability or obligations under this Decree to any other party or person.

8. *Computation of Time.* Unless otherwise provided, dates and time periods specified in or under this Decree are in calendar days. If the date for submission of any item or notification required by this Decree falls upon a weekend or state or federal holiday, the time period for submission of that item or notification is extended to the next working day following the weekend or holiday. Submission shall be deemed accomplished when the item is delivered or mailed to the required party or parties.

9. *Institutional Controls.* The U.S. EPA has determined that the institutional controls set forth in Appendix 2, Section II, SOW hereto are necessary to effectuate the remedial action for the facility and to protect the public health or welfare or the environment.

## VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANTS

10. *Selection of Architect/Engineer and Contractor(s).*

a. *Architect/Engineer.* All remedial design work to be performed by Settling Defendants pursuant to this Consent Decree shall be under the direction and supervision of a qualified professional architect or engineer. Selection of any such architect or engineer is subject to approval by U.S. EPA, after providing the State a reasonable opportunity for review and comment.

b. *Contractor.* All remedial action work to be performed by the Settling Defendants pursuant to this Consent Decree shall be under the direction and supervision of a qualified professional engineer or other appropriate qualified professional. As soon as possible after execution of the Decree by Settling Defendants, and at least 30 days prior to the date upon which initiation of remedial action work is required under this Decree, the Settling Defendants shall notify U.S. EPA, in writing, of the name, title, and qualifications of the proposed engineer or other appropriate qualified professional, and the names of principal contractors and subcontractors proposed to be used in carrying out the Work to be performed pursuant to this Constant Decree. Selection of any such engineer, other qualified professional, contractor and/or subcontractor shall be subject to approval by the U.S. EPA, after providing the State a reasonable opportunity for review and comment. EPA shall specify the reasons for not ap-

proving such contractor, subcontractor, engineer or other qualified professional.

c. *Disapproval of Architect/Engineer or Contractor.* If U.S. EPA disapproves of the initial or subsequent selection of an architect, engineer, other qualified professional, or contractor, Settling Defendants shall submit a list of alternate architects, engineers, and other qualified professionals or contractors to U.S. EPA within 30 days of receipt of the notice of disapproval. Within 14 days from receipt of the list U.S. EPA, after providing the State a reasonable opportunity for review and comment, shall provide written notice of the names of the architects, engineers, other qualified professionals or contractors on the list of which it approves. Settling Defendants may select any approved, architect, engineer, other qualified professional or contractor from the list and shall notify U.S. EPA of the name of the person or entity selected within 21 days of receipt of the list. If U.S. EPA does not approve or disapprove of any proposed architect, engineer, other qualified professional or contractor or any proposed list of alternate architects, engineers, other qualified professionals or contractors within 14 days and the delay prevents Settling Defendants from meeting one or more deadlines in a plan approved by U.S. EPA pursuant to this decree, Settling Defendants may seek relief under the provisions of Section XIII hereof.

d. *Replacement of Architect/Engineer or Contractor.* If at any time Settling Defendants propose to change an architect, engineer, other qualified professional or contractor previously approved by U.S. EPA, they shall give written notice to U.S. EPA and the State of the name, title and qualifications of the proposed new architect, engineer, other qualified professional or contractor. Such architect, engineer, other qualified professional or contractor shall not perform any Work until approval by U.S. EPA, after providing the State a reasonable opportunity for review and comment, has been given.

11. *Scope of Work.* Appendix 2 to this Consent Decree provides a Scope of Work ("SOW") for the completion of remedial design and remedial action at the Facility. This Scope of Work is incorporated into and made an enforceable part of this Consent Decree.

12. *Cleanup and Performance Standards/Technical Impracticability.*

a. *Cleanup Standards.*

1. The Work performed under this Consent Decree shall meet the Cleanup and Performance Standards set forth in the SOW.

b. *Technical Impracticability.*

1. *Petition.* After a minimum of ten (10) years of operation of the groundwater extraction system, the Settling Defendants may petition the U.S. EPA to waive compliance with one or more of the Clean-up and Performance Standards contained in the SOW, based upon a demonstration, pursuant to § 121(d)(4) of CERCLA, 42 U.S.C. § 9621(d)(4), that achievement of such Clean-up and Performance Standard is technically impracticable from an engineering perspective.

2. *Determination.* U.S. EPA, after providing the State a reasonable opportunity for review and comment, shall review and consider the information in the Petition submitted pursuant to Subparagraph b.1 and shall make a determination, in accordance with applicable laws and regulations in effect at the time of the Petition, whether compliance with any of the Clean-up and Performance Standards shall be waived, and what alternative Clean-up and Performance Standards, or other protective measures, shall be established.

3. *Review.* Settling Defendants may challenge the U.S. EPA's determination under Subparagraph b.2 in accordance with the Dispute Resolution provisions under Paragraph XIV of this Consent Decree. The U.S. EPA's determination shall be treated as a determination regarding adequacy or selection of the remedy.

4. *Periodic review.* Any technical impracticability waiver granted pursuant to this Subparagraph shall be subject to the periodic review provisions of Paragraph VIII of this Consent Decree and § 121(c) of CERCLA, 42 U.S.C. § 9621(c).

13. *Work Plan.* a. Within 45 days of the execution of this Consent Decree by the Settling Defendants, the Settling Defendants shall commence work as specified in Appendix 2 by submitting the Draft Incineration Work Plan to U.S. EPA and the State.

Settling Defendants shall not be required under the terms of this Decree to pay any Oversight Costs for U.S. EPA's review of their work prior to execution of the decree by Settling Defendants under this paragraph, but following execution shall pay all such Oversight Costs that accrued subsequent to execution pursuant to Section XVI hereof.

b. Settling Defendants shall submit the remaining plans pursuant to the schedule specified in Appendix 2.

c. All plans and modifications submitted shall be developed in conformance with the RODs in the manner described in the SOW and the NCP. U.S. EPA Superfund Remedial Design and Remedial action Guidance and any additional guidance documents provided by U.S. EPA that are in effect at the time of plan submission shall be followed to the extent that they apply to the activities at the Site. If an applicable U.S. EPA guidance document is changed or is issued which requires modification of plans under development, the deadlines of such plans shall be adjusted as necessary to incorporate such guidance into the plan being developed.

d. All plans shall be subject to review, modification and approval by U.S. EPA, after providing the State a reasonable opportunity for review and comment, in accordance with the Procedures set forth in para. 14 below.

e. All approved plans shall be deemed incorporated into and made an enforceable part of this Consent Decree. All work shall be conducted in accordance with the National Contingency Plan, the U.S. EPA Superfund Remedial Design and Remedial Action Guidance, and the requirements of this Consent Decree, including the standards, specifications and schedule contained in the Work Plan.

14. *Approval Procedures for Work Plans and Other Documents.*

a. Upon review of each work plan or other document required to be submitted and approved by U.S. EPA pursuant to this Decree, and after providing the State with a reasonable opportunity for review and comment, the U.S. EPA Remedial Project Manager (the "RPM") shall notify Settling Defendants, in writing that a document is (1) approved, (2) disapproved, (3) modified by U.S. EPA to cure deficiencies, or (4) returned to Settling Defendants for modification. An explanation shall be provided for any disapproval or required modification.

b. Upon approval or modification of a submission by U.S. EPA, Settling Defendants shall proceed to implement the work required.

c. In the event of partial U.S. EPA disapproval or request for modification by Settling Defendants, the Settling Defendants shall proceed to implement the work in any approved portions of the submission upon request by U.S. EPA, to the extent that such work can be implemented prior to approval of the revised submission and shall submit a revised document to U.S. EPA curing the deficiencies within 30 calendar days of receipt of notice from U.S. EPA or such other time as may be agreed to by the parties.

d. Settling Defendants may submit any disapproval, modification, or conditions of approval to which they object, for dispute resolution pursuant to Section XIV hereof. The provisions of Section XIV (Dispute Resolution) and Section XVII (Stipulated Penalties) shall govern the implementation of Work and accrual and payment of any stipulated penalties during dispute resolution. Implementation of non-deficient portions of the submission shall not relieve Settling Defendants of any liability for stipulated penalties under Section XVII.

## VII. ADDITIONAL WORK AND MODIFICATION OF THE SOW

15. *No Warranty.* The provisions of the SOW attached as Appendix 2 reflect the parties' best efforts at the time of execution of this Decree to define the technical work required to perform the remedial action con-

tained in the RODs in the manner described in the SOW.

a. The Parties acknowledge and agree that approval by U.S. EPA of either the SOW or the Work Plan will not constitute a warranty or representation of any kind that the SOW or Work Plan will achieve the Cleanup and Performance Standards, and shall not foreclose the United States from seeking compliance with the applicable Cleanup and Performance Standards.

16. *Modification of the Scope of Work.* The parties recognize that modification of the SOW may be required at some point in the future, *e.g.* to provide for additional work needed to meet the Clean-up and Performance Standards specified above. In such event, the following procedures shall be followed to amend the SOW:

a. The party that determines that additional work or other modification of the SOW is necessary shall provide written notice of such determination to the other parties.

b. The other parties shall respond to such notice in writing within thirty (30) days of receipt or such other time as may be agreed to by the parties.

17. *Modification by Agreement.* If the parties agree on the modifications to the SOW, the agreement shall be in writing and shall be submitted, along with the amended SOW, for approval of the Court.

18. *Dispute Resolution.* If the parties do not agree on the proposed modifications, they shall initiate dispute resolution pursuant to Section XIV of this Decree. The scope and standard of review set forth in para. 40 shall govern any judicial determination in such dispute.

## VIII. U.S. EPA PERIODIC REVIEW TO ASSURE PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT

19. To the extent required by Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and any applicable regulations, U.S. EPA shall review the remedial action at the Facility at least every five (5) years after the entry of

this Consent Decree to assure that human health and the environment are being protected by the remedial action being implemented. If upon such review, U.S. EPA determines that further response action is appropriate at the Facility in accordance with Section 104 or 106, then, consistent with Section XVIII of this Consent Decree, the U.S. EPA, after providing the State with a reasonable opportunity for review and comment, may take or require such action pursuant to Section 104 or 106.

20. Settling Defendants shall be provided with an opportunity to confer with U.S. EPA on any response action proposed as a result of U.S. EPA's 5–year review and to submit written comments for the record. The provisions of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j) will govern any judicial review of U.S. EPA's determination that any such remedial action is necessary or the nature of any such action.

## IX. QUALITY ASSURANCE

21. Settling Defendants shall use quality assurance, quality control, and chain of custody procedures in accordance with U.S. EPA's "Interim Guidelines and Specifications For Preparing Quality Assurance Project Plans" (QAM–005/80) and subsequent amendments to such guidelines upon notification to Settling Defendants of such amendments by U.S. EPA. Amended guidelines shall apply only to procedures conducted after such notification. Prior to the commencement of any monitoring project under this Consent Decree, Settling Defendants shall submit Quality Assurance Project Plan(s) ("QAPP") to U.S. EPA consistent with the SOW and applicable guidelines, in accordance with paras. 13–14 hereof. Validated sampling data generated consistent with the QAPP(s) and reviewed and approved by EPA shall be admissible as evidence, without objection as to admissibility, in any proceeding to enforce this Decree. Each laboratory utilized by Settling Defendants in implementing this Consent Decree shall be subject to approval by U.S. EPA. Settling Defendants shall assure that U.S. EPA personnel or authorized representatives are allowed access to each such laboratory. In addition, Settling Defen-

dants shall have their laboratory analyze samples submitted by U.S. EPA for quality assurance monitoring.

## X. FACILITY ACCESS, SAMPLING, DOCUMENT AVAILABILITY

22. *Access to Facility and Other Property Controlled by Settling Defendants.* As of the date of execution of this Consent Decree by the Settling Defendants, the United States and the State and Settling Defendants' contractors shall have access at all times to the Facility, and shall have access to any other property controlled by or available to Settling Defendants to which access is necessary to effectuate the remedial design or remedial action required pursuant this Decree. Access shall be allowed for the purposes of conducting activities related to this Decree, including but not limited to:

a. Monitoring the Work or any other activities taking place at the Facility;

b. Verifying any data or information submitted to the United States;

c. Conducting investigations relating to contamination at or near the Facility;

d. Obtaining samples;

e. Assessing the need for, planning, or implementing additional response actions at or near the Facility;

f. Inspecting and copying records, operating logs, contracts or other documents maintained or generated by Settling Defendants or their agents, consistent with this Decree and applicable law; or

g. Assessing Settling Defendants' compliance with this Consent Decree.

23. *Access to Other Property.* To the extent that the Facility or other areas where Work is to be performed hereunder is presently owned by persons other than Settling Defendants, Settling Defendants shall use best efforts to secure from such persons access for Settling Defendants' contractors, the United States, the State and their authorized representatives, as necessary to effectuate this Consent Decree. If access is not obtained despite best efforts within 14 days of the date of execution of this Decree by

Settling Defendants, Settling Defendants shall promptly notify the United States. The United States thereafter may assist Settling Defendants in obtaining access, to the extent necessary to effectuate the remedial action for the Facility, using such means as it deems appropriate. The United States' costs in this effort, including attorney's fees and other expenses and any compensation that the United States may be required to pay to the property owner, shall be considered costs of response and shall be reimbursed by Settling Defendants in accordance with Section XVI of this Decree (Reimbursement).

24. *Access Authority Retained.* Nothing herein shall restrict in any way the United States' access authorities and rights under CERCLA, RCRA or any other applicable statute, regulation or permit.

25. *Sampling Availability.* Settling Defendants shall make available to U.S. EPA and the State the results of all sampling and/or tests or other data generated by Settling Defendants with respect to the implementation of this Consent Decree. U.S. EPA upon request, shall make available to the Settling Defendants the results of sampling and/or tests or other data generated by U.S. EPA, or its contractors.

26. *Split Samples.* Upon request a party taking samples shall allow other parties and/or their authorized representatives to take split or duplicate samples. The party taking samples shall give at least 14 days prior notice of sample collection activity to the other parties.

## XI. REPORTING REQUIREMENTS

27. *Progress Reports.* Settling Defendants shall prepare and provide to the United States written monthly progress reports which will include those elements specified in the SOW. Progress reports are to be submitted to U.S. EPA by the tenth business day of every month following the execution date of this Consent Decree until construction of all components of the Remedial Action is completed. Thereafter, Settling Defendants shall submit semi-annual progress reports for operation and maintenance activities.

28. *Other Reporting Requirements.* Settling Defendants shall submit reports, plans and data required by the SOW, the RD/RA Work Plan or other approved plans in accordance with the schedules set forth in such plans.

29. *Reports of Releases.* Upon the occurrence of any event during performance of the Work which, pursuant to Section 103 of CERCLA, requires reporting to the National Response Center, Settling Defendants shall promptly orally notify the U.S. EPA Remedial Project Manager ("RPM") or On–Scene Coordinator ("OSC"), or in the event of the unavailability of the U.S. EPA RPM, the Emergency Response Section, Region V, United States Environmental Protection Agency, in addition to the reporting required by Section 103. Within 20 days of the onset of such an event, Settling Defendants shall furnish to the United States a written report setting forth the events which occurred and the measures taken, and to be taken, in response thereto. Within 30 days of the conclusion of such an event, Settling Defendants shall submit a report setting forth all actions taken to respond thereto.

30. *Annual Report.* Settling Defendants shall submit each year, within sixty (60) days of the anniversary of the entry of the Consent Decree, a report to the Court and the parties setting forth the status of response actions at the Facility, which shall include at a minimum a statement of major milestones accomplished in the preceding year, a statement of tasks remaining to be accomplished, and the schedule for implementation of the remaining Work.

## XII. REMEDIAL PROJECT MANAGER/PROJECT COORDINATORS

31. *Designation/Powers.* U.S. EPA shall designate a Remedial Project Manager ("RPM") and/or an On Scene Coordinator ("OSC") for the Facility, and it may designate other representatives, including U.S. EPA employees, and federal contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree. The RPM/OSC shall have the authority lawfully vested in an RPM/OSC by the National Contingency Plan, 40 CFR Part 300. In addition, the RPM/OSC shall have the authority to halt any work required by this Consent Decree and to take any necessary response action when conditions at the Facility may present an imminent and substantial endangerment to public health or welfare or the environment. Settling Defendants shall also designate a Project Coordinator who shall have primary responsibility for implementation of the Work at the Facility.

32. *Communications.* To the maximum extent possible, except as specifically provided in the Consent Decree, communications between Settling Defendants, and U.S. EPA concerning the implementation of the work under this Consent Decree shall be made between the Project Coordinators and the RPM/OSC.

33. *Identification of Personnel.* Within thirty (30) calendar days of the execution of this Consent Decree by Settling Defendants, Settling Defendants, and U.S. EPA shall notify each other, in writing, of the name, address and telephone number of the designated Project Coordinator and an Alternate Project Coordinator, and the RPM/OSC and Alternate RPM/OSC. If the identity of any of these persons changes, notice shall be given to the other parties at least five (5) business days before the changes become effective.

## XIII. FORCE MAJEURE

34. *Definition.* "Force Majeure" for purposes of this Consent Decree is defined as any event arising from causes beyond the control of Settling Defendants which delays or prevents the performance of any obligation under this Consent Decree notwithstanding Settling Defendants' best efforts to avoid the delay. Increased costs or expenses or non-attainment of the Performance or Clean–Up Standards shall not constitute "force majeure" events.

35. *Notice to RPM Required.* When circumstances occur which may delay the completion of any phase of the Work or delay access to the Facility or to any property on which any part of the Work is to be performed, whether or not caused by a "force

majeure" event, Settling Defendants shall promptly notify the RPM by telephone, or in the event of his or her unavailability, the Director of the Waste Management Division of U.S. EPA. Within twenty (20) days of the event which Settling Defendants contend is responsible for the delay, Settling Defendants shall supply to the United States in writing the reason(s) for and anticipated duration of such delay, the measures taken and to be taken by Settling Defendants to prevent or minimize the delay, and the timetable for implementation of such measures. Failure to give such oral notice and written explanation in a timely manner shall constitute a waiver of any claim of force majeure.

36. If U.S. EPA agrees that a delay is or was attributable to a "force majeure" event, the Parties shall modify the SOW or RD/RA Work Plan to provide such additional time as may be necessary to allow the completion of the specific phase of Work and/or any succeeding phase of the Work affected by such delay.

37. If U.S. EPA does not agree with Settling Defendants that the reason for the delay, was a "force majeure" event, that the duration of the delay is or was warranted under the circumstances, or that the length of additional time requested by Settling Defendants for completion of the delayed work is necessary, U.S. EPA shall so notify Settling Defendants in writing. Settling Defendants may initiate a formal dispute resolution proceeding under para. 39 below, but no later than 15 days after receipt of such notice. In such a proceeding, Settling Defendants have the burden of proving that the event was a force majeure, that best efforts were exercised to avoid and mitigate the effects of the delay, that the duration of the delay is or was warranted, that the additional time requested for completion of the Work involved is necessary to compensate for the delay, and that the notice provisions of para. 35 were complied with.

## XIV. DISPUTE RESOLUTION

38. The Parties to this Consent Decree shall attempt to resolve expeditiously any disagreements concerning the meaning, application or implementation of this Consent Decree. Any party seeking dispute resolution first shall provide the other parties with an "Informal Notice of Dispute" in writing and request an informal dispute resolution period, which shall not exceed thirty (30) days unless extended by agreement of the parties.

39. If the dispute is not resolved within the informal discussion period, any party may initiate formal dispute resolution by giving a written "Formal Notice of Dispute" to the other parties no later than the 15th day following the Conclusion of the informal dispute resolution period. A party shall seek formal dispute resolution prior to the expiration of the informal discussion period where the circumstances require prompt resolution.

40. Formal dispute resolution for disputes pertaining to the selection or adequacy of remedial design or remedial action (including the selection and adequacy of any plans which are required to be submitted for government approval under this Decree and the adequacy of Work performed) shall be conducted according to the following procedures:

a. Within ten (10) business days of the service of the Formal Notice of Dispute pursuant to the preceding paragraph, or such other time as may be agreed to by the parties, the party who gave the notice shall serve on the other parties to this Decree a written statement of the issues in dispute, the relevant facts upon which the dispute is based, and factual data, analysis or opinion supporting its position (hereinafter the "Statement of Position"), and shall provide copies of all supporting documentation on which such party relies.

b. Opposing parties shall serve their Statements of Position and copies of supporting documentation within twenty (20) days after receipt of the complaining party's Statement of Position or such other time as may be agreed to by the parties.

c. U.S. EPA shall maintain an administrative record of any dispute governed by this paragraph. The record shall include the Formal Notice of Dispute, the Statements of Position, all supporting documentation submitted by the parties, and any other material

on which the U.S. EPA decision maker relies for the administrative decision provided for below. The record shall be available for inspection and copying by all parties. The record shall be closed no less than ten (10) days before the administrative decision is made, and U.S. EPA shall give all parties prior notice of the date on which the record will close.

d. Upon review of the administrative record the U.S. EPA Region V Waste Management Division Director, shall issue a final decision and order resolving the dispute.

e. Any decision and order of U.S. EPA pursuant to subparagraph d. shall be reviewable by this Court, provided that a Notice of Judicial Appeal is filed within 20 business days of receipt of U.S. EPA's decision and order. Judicial review will be conducted on U.S. EPA's administrative record and U.S. EPA's decision shall be upheld unless it is demonstrated to be arbitrary and capricious.

41. Judicial dispute resolution for any issues not governed by the preceding paragraph may be initiated by petition to the Court and shall be governed by the Federal Rules of Civil Procedure. Except as specifically provided in other provisions of this Decree, e.g. Section XIII, this Decree does not establish procedures or burdens of proof for such dispute resolution proceedings.

42. The invocation of the procedures stated in this Section shall not extend or postpone Settling Defendants' obligations under this Consent Decree with respect to the disputed issue unless and until U.S. EPA agrees otherwise or the Court so orders. EPA's position on an issue in dispute shall control until such time as the Court orders otherwise in accordance with the provisions of this Section.

43. Any applicable Stipulated Penalties continue to accrue during dispute resolution, as provided in Section XVII hereof. Settling Defendants may seek forgiveness of stipulated penalties that accrue during dispute resolution by petition to U.S. EPA and/or the Court pursuant to para. 60. below.

44. Upon the conclusion of any formal or informal dispute resolution, or judicial order, under this Section which has the effect of nullifying or altering any provision of the RD/RA Work Plan or any other plan or document submitted and approved pursuant to this Decree, Settling Defendants shall submit an amended plan, in accordance with the decision, to U.S. EPA within thirty (30) days of receipt of the final order or decision. Amendments of the SOW as a result of dispute resolution proceedings are governed by Section VII above. Amendments of a plan or other document as a result of dispute resolution shall not alter any dates for performance unless such dates have been specifically changed by the order or decision. Extension of one or more dates of performance in the order or decision does not extend subsequent dates of performance for related or unrelated items of Work unless the order or decision expressly so provides or the parties so agree.

## XV. RETENTION AND AVAILABILITY OF INFORMATION

45. Settling Defendants shall make available to U.S. EPA and shall retain the following documents until 6 years following the third "five-year review" conducted for the Facility pursuant to Section 121(c) of CERCLA (or the final review, if there are fewer than three reviews): all records and documents in their possession, custody, or control which relate to the performance of this Consent Decree, including, but not limited to, documents reflecting the results of any sampling, tests, or other data or information generated or acquired by any of them, or on their behalf, with respect to the Facility and all documents pertaining to their own or any other person's liability for response action or costs under CERCLA. After this period of document retention, Settling Defendants shall notify U.S. DOJ and U.S. EPA at least ninety (90) calendar days prior to the destruction of any such documents, and upon request by U.S. EPA Settling Defendants shall relinquish custody of the documents to U.S. EPA.

46. Settling Defendants may assert business confidentiality claims covering part or all of the information provided in connection with this Consent Decree in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C.

▬▬▬▬

§ 9604(e)(7), and pursuant to 40 CFR 52.-203(b) and applicable State law. Information determined to be confidential by U.S. EPA and the State will be afforded the protection specified in 40 CFR Part 2, Subpart B and, if determined to be entitled to confidential treatment under State law by the State, afforded protection under State law by the State. If no such claim accompanies the information when it is submitted to U.S. EPA and the State the public may be given access to such information without further notice to Settling Defendants.

47. Information acquired or generated by Settling Defendants in performance of the Work that is subject to the provisions of Section 104(e)(7)(F) of CERCLA, 42 U.S.C. § 904(e)(7)(F), shall not be claimed as confidential by Settling Defendants.

48. In the event that Settling Defendants' obligation to produce documents under this Section includes documents which are privileged from disclosure as attorney-client communications, attorney work-product or other privilege recognized by law, Settling Defendants may seek to withhold production of such documents to avoid improper disclosure. At the time production is requested, Settling Defendants must provide the United States all information necessary to determine whether the document is privileged, including such information as is generally required under the Federal Rules of Civil Procedure. If the United States does not agree with the Settling Defendant's claim of privilege, Settling Defendants may seek protection of the documents from the Court. Settling Defendants shall not withhold as privileged any information or documents that are required by this Consent Decree to be created, generated or collected, regardless of whether the document has been generated in the form of an attorney client communication or other generally privileged manner. Settling Defendants may not withhold as privileged any documents that are subject to the public disclosure provision of Section 104(e)(7)(F) of CERCLA, 42 U.S.C. § 9604(e)(7)(F).

## XVI. REIMBURSEMENT

49. Settling Defendants shall pay all oversight costs, all costs of access required to be paid pursuant to Section X hereof, and all costs incurred in enforcing this decree, to the extent that such costs are incurred by the United States after execution of this Consent Decree by the Settling Defendants (hereinafter referred to collectively as "Future Response Costs").

50. The United States shall submit its claim[s] for Future Response Costs incurred after execution of the Consent Decree by Settling Defendants up to the date of entry of the Decree as soon as practicable after entry of the Decree. Claims for Future Costs shall be submitted periodically by U.S. EPA, as practicable. Payments shall be made within 30 days of the submission of the above claims. Payment shall be made to the EPA Hazardous Substances Superfund, delivered to the U.S. EPA Superfund Accounting, P.O. Box 70753, Chicago, Illinois 60673 in the form of a certified or cashier check payable to "EPA Hazardous Substances Superfund" and referencing CERCLA No. H9 and DOJ Case No. 90-11-3-289. A copy of such check shall be sent to the Director, Waste Management Division, U.S. EPA, Region V and to the Assistant Attorney General, Land and Natural Resources Division, U.S. Department of Justice, at the addresses provided in Section XXVI (Notices). Settling Defendants may inspect the United States' cost documentation upon request.

51. Settling Defendants may agree among themselves as to the apportionment of responsibility for the payments required by this Section, but their liability to the United States for these payments shall be joint and several.

## XVII. STIPULATED PENALTIES

52. Settling Defendants shall pay stipulated penalties in the amounts set forth below to the United States for each failure to complete any of the following requirements of this Consent Decree in an acceptable manner and within the time schedules specified in the SOW, the RD/RA work plan or in

other plans submitted and approved under this Consent Decree:

**PENALTY**

| | PER DAY UP TO 30 DAYS | PER DAY BETWEEN 30–60 DAYS | PER DAY AFTER 60 DAYS |
|---|---|---|---|
| Failure to submit Progress Reports | 500 | 2500 | 5000 |
| Failure to submit any of the plans specified in Section III, Tasks 1 and 2 of SOW | 2000 | 4000 | 8000 |
| Failure to complete the following components of the remedial action: | | | |
| Fence Installation | 2,000 | 4,000 | 8,000 |
| Construction of Landfill Cap | 2,000 | 4,000 | 8,000 |
| Construction of Extraction/Injection well and Treatment System | 2,000 | 4,000 | 8,000 |
| Excavation of Drums and Soils in Area 1 | 2,000 | 4,000 | 8,000 |
| Incineration of Drums and Other Soils | 2,000 | 4,000 | 8,000 |
| Residual Soil Remediation | 2,000 | 4,000 | 8,000 |
| Failure to comply with notice requirements | 500 | 2,500 | 5,000 |

53. All penalties begin to accrue on the day after complete performance is due or the day a violation occurs, and continue to accrue through the final day of correction of the noncompliance or completion of performance. Any modifications of the time for performance shall be in writing and approved by U.S. EPA. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

54. Following U.S. EPA's determination that Settling Defendants have failed to comply with the requirements of this Consent Decree, U.S. EPA shall give Settling Defendants written notification of the same and describe the non-compliance. This notice shall also indicate the amount of penalties due. However, penalties shall accrue as provided in the preceding paragraph regardless of whether U.S. EPA had notified Settling Defendants of a violation.

55. All penalties owed to the United States under this Section shall be payable within 30 days of receipt of the notification of non-compliance, unless Settling Defendants

invoke the dispute resolution procedures under Section XIV.

56. Settling Defendants may dispute the United States' right to the stated amount of penalties on the grounds that the violation is excused by the Force Majeure provisions of Section XIII or that it is based on a mistake of fact. The dispute resolution procedures under Section XIV shall be followed for such a dispute.

57. Neither the filing of a petition to resolve a dispute nor the payment of penalties shall alter in any way Settling Defendants' obligation to continue and complete the performance required hereunder.

58. Penalties shall continue to accrue as provided in para. 55 during the dispute resolution period, but need not be paid until the following decision points:

a. If the dispute is resolved by agreement or by decision or order of U.S. EPA which is not appealed to this Court, accrued penalties shall be paid to U.S. EPA within sixty (60) days of the agreement or the receipt of U.S. EPA decision or order;

b. If the dispute is appealed to this Court, accrued penalties shall be paid to U.S. EPA within sixty (60) days of receipt of the Court's decision or order, except as provided in subparagraph c below;

c. If the District Court's decision is appealed by any party, Settling Defendants shall pay all accrued penalties into an interest-bearing escrow account within sixty (60) days of receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every sixty (60) days. Within fifteen (15) days of receipt of the appellate court decision, the escrow agent shall pay the balance of the account to U.S. EPA and/or to Settling Defendants to the extent that they prevail, as determined pursuant to the following paragraph.

59. Settling Defendants shall not owe stipulated penalties for any items upon which they prevail in dispute resolution. Settling Defendants shall request a specific determination at each stage of dispute resolution as to the issues and items upon which they have prevailed and as to the amount of any stipulated penalties owed.

60. Notwithstanding the above provisions, the Settling Defendants shall have the right to petition the Court or U.S. EPA (according to the level of dispute resolution reached) for forgiveness of stipulated penalties that accrue during dispute resolution for items upon which they did not prevail, based on a finding (1) that the delay in work or other violation that caused the stipulated penalty to accrue was reasonable and appropriate during the dispute resolution proceeding (2) that Settling Defendants' position regarding the dispute had substantial support in law and fact and reasonably could have been expected to prevail, considering the applicable standard of review, and (3) that Settling Defendants sought dispute resolution at the earliest practicable time and took all other appropriate steps to avoid any delay in remedial action work as a result of the dispute. If the Court or U.S. EPA so finds, they may grant an appropriate reduction in the stipulated penalties that accrued during the dispute resolution period. Settling Defendants shall have the burdens of proof and persuasion on any provision submitted under this provision.

61. Interest shall begin to accrue on the unpaid balance of stipulated penalties on the day following the date payment is due. Pursuant to 31 U.S.C. § 3717, interest shall accrue on any amounts overdue at a rate established by the Department of Treasury for any period after the date of billing. A handling charge will be assessed at the end of each 30 day late period, and a six percent per annum penalty charge will be assessed if the penalty is not paid within 90 days of the due date. Penalties shall be paid as specified in para. 50 hereof.

62. If the Settling Defendants fail to pay stipulated penalties, the United States may institute proceedings to collect the penalties. In any such proceeding, penalties shall be paid as provided in para. 50 above.

63. Notwithstanding any of the above provisions, U.S. EPA may elect to assess civil penalties and/or to bring an action in U.S. District Court pursuant to Section 109 CERCLA to enforce the provisions of this

Consent Decree. Payment of stipulated penalties shall not preclude U.S. EPA from electing to pursue any other remedy or sanction to enforce this Consent Decree, and nothing shall preclude U.S. EPA from seeking statutory penalties against Settling Defendants for violations of statutory or regulatory requirements. However, U.S. EPA may not obtain stipulated penalties and statutory penalties for the same violation.

## XVIII.  COVENANT NOT TO SUE; CONTRIBUTION PROTECTION

64.  Except as otherwise specifically provided in the following paragraph or elsewhere in this Decree, the United States covenants not to sue or take administrative action against the Settling Defendants or their officers, directors, and employees for Covered Matters.  For purposes of this covenant not to sue and contribution protection under Section 113 of CERCLA, covered matters shall mean claims available to the United States under Sections 106 and 107 of CERCLA and Section 7003 of RCRA, for the Work to be performed under this Decree and for any monies paid by Settling Defendants to the United States pursuant to Section XVI of this Decree.

"Covered Matters" does not include:

a.  Liability arising from hazardous substances removed from the Facility;

b.  Natural resource damages;

c.  Criminal liability;

d.  Claims based on a failure by the Settling Defendants to meet the requirements of this Consent Decree;

e.  Any matters for which the United States is owed indemnification under Section XIX hereof;

f.  Liability for violations of Federal law which occur during implementation of the remedial action.

g.  Liability for performance of remedial design or remedial action at the Facility other than the Work required hereunder.

h.  Liability for reimbursement to the United States for any response costs other than those paid hereunder, including without limitation, any response costs incurred prior to the entry of this Consent Decree.

65.  Notwithstanding any other provision in this Consent Decree, (1) the United States reserves the right to institute proceedings in this action or in a new action or to issue an Order seeking to compel the Settling Defendants to perform any additional response work at the Facility, and (2) the United States reserves the right to institute proceedings in this action or in a new action seeking to reimburse the United States for its response costs relating to the Facility, if:

a.  for proceedings prior to U.S. EPA certification of completion of the remedial action concerning the Facility,

i.  conditions at the Facility, previously unknown to the United States, are discovered after the execution of this Consent Decree by Settling Defendants, or

ii.  information is received, in whole or in part, after the execution of this Consent Decree by Settling Defendants,

and these previously unknown conditions or this information indicates that the remedial action is not protective of human health and the environment; and

b.  for proceedings subsequent to U.S. EPA certification of completion of the remedial action concerning the Facility,

i.  conditions at the Facility, previously unknown to the United States, are discovered after the certification of completion by U.S. EPA, or

ii.  information is received, in whole or in part, after the certification of completion by U.S. EPA,

and these previously unknown conditions or this information indicates that the remedial action is not protective of human health and the environment.

66.  For purposes of subpara. a. of the preceding paragraph, the information received by and the conditions known to the United States are that information and those conditions set forth in the Records of Decision (the "ROD") attached as Appendix 1 hereto or in documents contained in U.S.

EPA's administrative record supporting the RODs. For purposes of subpara. b. of the preceding paragraph, the information received by and the conditions known to the United States are that information and those conditions set forth in the RODs, the administrative record supporting the RODs, or in reports or other documents submitted to U.S. EPA pursuant to this Consent Decree or generated by U.S. EPA in overseeing this Consent Decree prior to certification of completion.

67. Notwithstanding any other provisions in this Consent Decree, the covenant not to sue in this Section shall not relieve the Settling Defendants of their obligation to meet and maintain compliance with the requirements set forth in this Consent Decree, including the conditions in the RODs in the manner described in the SOW, which are incorporated herein, and the United States reserves its rights to take response actions at the Facility in the event of a breach of the terms of this Consent Decree and to seek recovery of costs incurred after execution of the Consent Decree by Settling Defendants: 1) resulting from such a breach; 2) relating to any portion of the Work funded or performed by the United States; or 3) incurred by the United States as a result of having to seek judicial assistance to remedy conditions at or adjacent to the Facility.

68. Settling Defendants hereby release and waive any rights to assert any claims against the United States or any agency of the United States relating to the Facility. However, the Settling Defendants reserve, and this Consent Decree is without prejudice to, actions against the United States based on negligent actions taken directly by the United States (not including oversight or approval of the Settling Defendants plans or activities) that are brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA.

69. Nothing in this Consent Decree shall constitute or be construed as a release or a covenant not to sue regarding any claim or cause of action against any person, firm, trust, joint venture, partnership, corporation or other entity not a signatory to this Consent Decree for any liability it may have arising out of or relating to the Facility. Except as otherwise expressly provided in this Consent Decree, the United States and each of the Settling Defendants expressly reserves the right to sue or continue to sue any person, in connection with the Facility.

70. With regard to claims for contribution against Settling Defendants for matters addressed in this Consent Decree, the Parties hereto agree that the Settling Defendants are entitled, as of the effective date of this Consent Decree, to such protection from contribution actions or claims as provided in CERCLA section 113(f)(2), 42 U.S.C. § 9613(f)(2).

## XIX. INDEMNIFICATION; OTHER CLAIMS

71. Settling Defendants agree to indemnify, save and hold harmless the United States, and/or its representatives from any and all claims or causes of action arising from the acts or omissions of Settling Defendants and/or their representatives, including contractors and subcontractors, in carrying out the activities pursuant to this Consent Decree. The United States shall notify Settling Defendants of any such claims or actions promptly after receipt of notice that such a claim or action is anticipated or has been filed.

72. The United States does not assume any liability of Settling Defendants by virtue of entering into this agreement or by virtue of any designation that may be made of Settling Defendants as U.S. EPA's representatives under Section 104(3) [sic] of CERCLA for purposes of carrying out this Consent Decree. The United States is not to be construed as a party to any contract entered into by Settling Defendants in carrying out the activities pursuant to this Consent Decree. The proper completion of the Work under this Consent Decree is solely the responsibility of Settling Defendants.

73. Settling Defendants waive their rights to assert any claims against the Hazardous Substances Superfund under CERCLA that are related to any costs incurred in the Work performed pursuant to this Con-

sent Decree, and nothing in this Consent Decree shall be construed as U.S. EPA's preauthorization of a claim against the Superfund.

## XX. INSURANCE/FINANCIAL RESPONSIBILITY

74. Settling Defendants shall purchase and maintain in force for the duration of the remedial action work, comprehensive general liability and automobile insurance with limits of one million dollars, combined single limit, naming as insured the United States. In addition, for the duration of this Consent Decree, Settling Defendants shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing work on behalf of Settling Defendants in furtherance of this Consent Decree. Prior to commencement of the Work at the Facility, Settling Defendants shall provide U.S. EPA with a certificate of insurance and, if requested, a copy of each insurance policy providing the required coverage. If Settling Defendants demonstrate by evidence satisfactory to the United States that any contractor or subcontractor provides the required insurance described above, or insurance covering the same risks but in a lesser amount, then Settling Defendants need provide only that portion of the insurance described above which is not maintained by the contractor or subcontractor. It is agreed that the required insurance may be supplied by endorsement to an existing policy, including, without limitation, a blanket policy, provided that the endorsement specifically allocates the required amount of coverage to the Facility.

75. Settling Defendants shall provide financial security, in the form of audited financial statements which satisfy the substantive criteria of 40 CFR 264.145, for an amount sufficient to assure completion of the Work at the Facility.

## XXI. NOTICES

76. Whenever, under the terms of this Consent Decree, notice is required to be given, a report or other document is required to be forwarded by one party to another, or service of any papers or process is necessitated by the dispute resolution provisions of Section XIV hereof, such correspondence shall be directed to the following individuals at the addresses specified below:

*As to the United States or U.S. EPA:*

a. Regional Counsel
   Attn: Metamora Landfill Coordinator (5CS)
   U.S. Environmental Protection Agency
   230 So. Dearborn
   Chicago, Illinois 60604

b. Director, Waste Management Division
   Attn: Metamora Landfill Remedial Project Manager (5HS–11)
   U.S. Environmental Protection Agency
   230 S. Dearborn Street
   Chicago, Illinois 60604

c. Assistant Attorney General
   Environment and Natural Resources Division
   U.S. Department of Justice
   10th & Pennsylvania Ave., N.W.
   Washington, D.C. 20530
   Ref. D.J. # *90–11–3–289*

*As to Settling Defendants:*
   Jack D. Shumate, Esq.
   Butzel Long
   Suite 900
   150 W. Jefferson
   Detroit, MI 48226–4430

*As to the State for documents subject to State review and comment:*
   Michigan Department of Natural Resources
   Knapps Building
   300 South Washington Square
   Lansing, Michigan 48909

## XXII. CONSISTENCY WITH NATIONAL CONTINGENCY PLAN

77. The United States agrees that the Work and additional work if any, if properly

performed, is consistent with the provisions of CERCLA and the National Contingency Plan.

## XXIII. ENDANGERMENT AND EMERGENCY RESPONSE

78. In the event of any action or occurrence during the performance of the Work which causes or threatens a release of a hazardous substance into the environment which presents or may present an imminent and substantial endangerment to public health or welfare or the environment, Settling Defendants shall immediately take all appropriate action to prevent, abate, or minimize such release and endangerment, and shall immediately notify the RPM or, if the RPM is unavailable, the U.S. EPA Emergency Response Section, Region V, U.S. EPA. Settling Defendants shall take such action in accordance with all applicable provisions of the Health and Safety/Contingency Plan developed pursuant to the SOW and approved by U.S. EPA. In the event that Settling Defendants fail to take appropriate response action as required by this paragraph and U.S. EPA takes such action instead, Settling Defendants shall reimburse all costs of the response action not inconsistent with CERCLA and the NCP. Payment of such response costs shall be made in the manner provided in Section XVI hereof.

79. Nothing in the preceding paragraph or in this Consent Decree shall be deemed to limit the response authority of the United States under 42 U.S.C. § 9604.

## XXIV. COMMUNITY RELATIONS

80. Settling Defendants shall cooperate with U.S. EPA in providing information regarding the progress of remedial design and remedial action at the Facility to the public. As requested by U.S. EPA, Settling Defendants shall participate in the preparation of all appropriate information disseminated to the public and in public meetings which may be held or sponsored by U.S. EPA to explain activities at or concerning the Facility. Settling Defendants shall have the same right as any other member of the public to make statements or comments at any public meeting.

## XXV. RETENTION OF JURISDICTION; MODIFICATION

81. *Retention of Jurisdiction.* This Court will retain jurisdiction for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, or relief as may be necessary or appropriate for the construction or modification of this consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIV hereof.

82. *Modification.* No material modification shall be made to this Consent Decree without written notification to and written approval of the parties and the Court except as provided below or in Section VII (Modification of the Scope of Work; Additional Work). The notification required by this Section shall set forth the nature of and reasons for any requested modification. No oral modification of this Consent Decree shall be effective. Nothing in this paragraph shall be deemed to alter the Court's power to supervise or modify this Consent Decree.

## XXVI. EFFECTIVE DATE AND CERTIFICATION OF COMPLETION OF REMEDY

83. This Consent Decree shall be effective upon the date of its entry by the Court, except to the extent provided in para. 13 regarding the commencement of work upon execution of the Consent Decree by Settling Defendants.

84. *Certification of Completion of Remedial Action.*

a. *Application.* When the Settling Defendants believe that the work specified in the SOW has been completed (except as provided in paragraph c. hereof) and that the demonstration of compliance with Cleanup and Performance Standards has been made in accordance with this Consent Decree, they shall submit to the United States a Notification of Completion of Remedial Action and a final report which summarizes the work done, any modification made to the SOW or

Work Plan(s) thereunder relating to the Cleanup and Performance Standards, and data demonstrating that the Cleanup and Performance Standards have been achieved. The report shall be prepared and certified as true and accurate by a registered professional engineer and the Settling Defendants' Project Coordinator, and shall include appropriate supporting documentation.

b. *Certification.* Upon receipt of the Notice of Completion of Remedial Action, U.S. EPA shall review the final report and supporting documentation, and the remedial actions taken. U.S. EPA shall issue a Certification of Completion of Remedial Action upon a determination that Settling Defendants have completed the work specified in the SOW and demonstrated compliance with Cleanup and Performance Standards, and that no further corrective action is required.

c. *Post-Certification Obligations.* Following Certification, Settling Defendants shall continue to perform the following Work: Operation and Maintenance, as described in the SOW.

85. *Effect of Settlement.* The entry of this consent decree shall not be construed to be an acknowledgment by the parties that the release or threatened release concerned constitutes an imminent and substantial endangerment to the public health or welfare or the environment. The Participation by any party in this decree shall not be considered an admission of liability for any purpose. Except as provided by Rule 408 of the Federal Rules of Evidence, the fact of such participation shall not be admissible in any judicial or administrative proceeding (except a proceeding to enforce this decree), as provided in section 122(d)(1)(B) of CERCLA.